CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
August 17, 2026
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

NAJEE FANIQUE HAIRSTON, )
)
Plaintiff, ) Case No. 7:24-cv-00778
)
v. ) **MEMORANDUM OPINION**
)
DREW SHELTON, ) By: Hon. Thomas T. Cullen
) United States District Judge
Defendant. )

---

Plaintiff Najee Fanique Hairston, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983 against Defendant Drew Shelton. (*See* Compl. [ECF No. 1].) This matter is before the court on Shelton's motion for summary judgment. (ECF No. 24.) For the following reasons, the court will grant the motion for summary judgment.

## I. BACKGROUND

This matter stems from events that allegedly occurred while Hairston was incarcerated at the Danville Adult Detention Center (the "jail") in Danville, Virginia. (Amend. Compl. at 2 [ECF. No. 8].). Shelton is a correctional health assistant at the jail, and in that role primarily assists jail physicians in providing healthcare services to inmates. (ECF No. 25-1 at 2–3.) Because Hairston and Shelton offer somewhat different accounts of what happened in this case, the court will summarize both accounts.

### A. Hairston's Factual Allegations

In his verified amended complaint, Hairston alleges that, during the week of September 20, 2024, while incarcerated at the jail, he sustained a spider bite below his right knee. (ECF

No. 8-1 at 1.)[1] One day after he was bitten, the bite wound became "very itchy and irritated," prompting Hairston to file a medical request with Shelton. (*Id.*) Three days later, Hairston had not received any response from Shelton and his symptoms had worsened. (*Id.*) Hairston accordingly visited the medical room to see Shelton. (*Id.*) Shelton examined Hairston and, after viewing the bite mark, told Hairston that he was going to prescribe him an antibiotic pill, "Bactrum," beginning at that evening's medical call. (*Id.*) According to Hairston, he had been prescribed and was taking ibuprofen for an unrelated medical issue at the time. (*Id.*)

The night following his visit with Shelton, Hairston went to medical call. (*Id.*) When Hairston received his pills, he noticed that they both looked the same. (*Id.*) Hairston immediately asked the officer distributing medication to inmates to describe the label of the package of the pill that was supposed to be his antibiotic. (*Id.*) The officer told Hairston that the package said "Bactrum" and showed the label to Hairston so he could confirm for himself. (*Id.*) After reviewing the label, Hairston took the two pills he was given and continued to take similar looking pills twice a day for the next two days. (*Id.*)

According to Hairston, his leg grew worse despite the medication he was taking. (*Id.*) Specifically, Hairston claims that his wound showed further signs of infection, was swelling, and was leaking puss. (*Id.*) The next morning, Hairston told the officer who was distributing medication, Captain Childress, that his leg was getting worse, that it was so painful he had difficulty walking, and that he needed medical attention. (*Id.* at 1–2.) After receiving his two pills, Hairston observed that they had the same stamp imprinted on them. (*Id.* at 2.) Hairston

[1] Because Hairston's amended complaint is verified (*see* ECF No. 8 at 3), it is properly considered an affidavit on summary judgment. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). And though Hairston's original complaint is also verified (*see* ECF No. 1 at 2), it does not present any facts relevant to his claims against Shelton that are not also stated in Hairston's amended complaint. (*See* ECF Nos. 1, 8.) Thus, the court will refer to Hairston's amended complaint to summarize his factual allegations.

then told Childress that the pills looked the same and, after examining the pills, Childress agreed. (*Id.*) Childress then observed that the pills in the "Bactrum" package looked the same and were stamped as "Ibuprofen 800." (*Id.*) Childress directed Hairston not to take the pills and to let him talk to Shelton once he arrived at the jail later that day. (*Id.*)

After not hearing from Shelton by the lunchtime medical call, Hairston went to the medical unit to see Shelton. (*Id.*) There, Hairston asked Shelton whether Childress had spoken to him about the pill issue. (*Id.*) Shelton allegedly "responded in a laughing [manner]," saying, "Yea[h][,] I fucked up and was rushing when I packaged your pills and packed the wrong pills." (*Id.*) Shelton then gave Hairston another pill that looked different from the others and told Hairston to take it, assuring him that it was "the right one this time." (*Id.* at 3.)

Hairston continued taking the new pills twice a day for three days, but his leg continued to swell and the wound became larger and deeper. (*Id.*) When Hairston was sent out to cut grass, he "could barely even walk." (*Id.*) Beginning in the first week of October 2024, Hairston continued writing to Shelton about his condition, seeking immediate medical attention, but Shelton never responded. (*Id.*) Hairston then wrote multiple requests to a major at the jail, who was "at the top of command" since the warden was away at the time. (*Id.*) The major did not respond to Hairston's requests either. (*Id.*)

On October 6, 2024, Hairston filed a request asking for a § 1983 form. (*Id.*) The next morning, Shelton called Hairston to come to the medical room. (*Id.*) When Hairston got there, he sat down and noticed that there were more officers present than was typical for a medical visit. (*Id.*) Hairston asked what was happening and whether he was "in trouble or something," to which Shelton responded, "We want to see your leg Mr. 1983 form." (*Id.*) Hairston pulled up his pant leg to reveal the bandaged wound, and Shelton "snatched off the bandage . . . in a

very aggressive manner." (*Id.* at 3–4.) Shelton then told Hairston that he had MRSA,[2] that it was contagious, and that he needed to be isolated in segregation. (*See id.* at 4.)

Hairston was placed in isolation until October 9, 2024, when he was called to see a Dr. Wang. (*Id.*) Dr. Wang observed Hairston's leg and asked him how long it had been like that. (*Id.*) Hairston told Dr. Wang that it had been that way for about two weeks. (*Id.*) Dr. Wang squeezed puss from the wound, re-bandaged it, and sent Hairston back to isolation. (*Id.*) Hairston never had any blood drawn or any other test performed to confirm that he had MRSA. (*Id.*) Thereafter, Hairston was prescribed another pill, along with "Bactrum," that he was directed to take for a week. (*Id.*) Hairston alleges that, as of mid-December 2024, his leg still felt weak and he feared the infection had caused internal damage. (*Id.*)

### B. Shelton's Factual Allegations

In his declaration, Shelton alleges that, on Thursday, October 3, 2024, Hairston filed an inmate administrative request seeking medical attention for his spider bite. (ECF No. 25-1 at 3.) During a medical call later that day, Hairston sought treatment from Shelton and reported that he had sustained the spider bite several days before. (*Id.*) According to Shelton, this was the first time he learned of Hairston's spider bite and, to Shelton's knowledge, it was the first time Hairston had sought medical treatment for the bite. (*Id.*) Shelton observed the area of the reported spider bite and saw a one-inch diameter mark with some swelling, which was consistent with the spider bite Hairston had reported to Shelton. (*Id.*)

After observing Hairston's wound, Shelton ordered a course of Bactrim double strength ("DS") to treat Hairston's spider bite. (*Id.*) To avoid delay in treating Hairston's injury,

[2] "MRSA" stands for methicillin-resistant staphylococcus aureus. (ECF No. 25-1 at 6.)

Shelton decided to provide Hairston with the Bactrim DS that he had in stock at the jail. (*Id.* at 4.) Shelton placed what he believed was Bactrim DS in blister packs so that the medication could be distributed to Hairston during medical calls the following day and over the weekend. (*Id.*) According to Shelton, the Bactrim DS he ordered for Hairston would not arrive at the jail until Monday, October 7, 2024. (*See id.*) Shelton knew that Hairston had been prescribed and was taking ibuprofen for an unrelated medical issue at the time. (*Id.*)

On Friday, October 4, 2024, Captain Childress, the on-duty watch commander, called Shelton to advise him that the medication he had placed in the blister packs was not Bactrim. (*Id.*) Shelton advised Childress not to give the incorrect medication to Hairston and that Shelton would review the medication upon his arrival at the jail later that morning. (*Id.*) After inspecting the medication, Shelton determined that he had placed 800 milligram ibuprofen tablets in the blister packs instead of the Bactrim DS that he intended. (*Id.*) Shelton then corrected the error and notified Hairston about the situation. (*Id.*) Hairston advised Shelton that he had no medical issues at the time and did not need to have his vital signs checked. (*Id.*) Hairston began receiving Bactrim DS later that morning. (*Id.* at 5.)

On Saturday, October 5, 2024, Hairston filed another inmate administrative request. (*See id.*) Over the weekend, Childress contacted Shelton to advise him that Hairston's spider bite was worsening. (*Id.*) Shelton advised Childress that he was out of town for the weekend and that Hairston was taking an antibiotic for the infection and could take ibuprofen for pain as needed. (*Id.*) Shelton also advised Childress that if he felt it was necessary, the officer could take Hairston to the emergency room for further treatment. (*Id.*) Shelton did not hear anything further about Hairston's medical condition until Shelton returned to work on Monday, October 7, 2024. (*Id.*)

On the morning of October 7th, Hairston was brought to the medical office to see Shelton for follow-up treatment. (*Id.*) Hairston presented swelling around the spider bite. (*Id.*) After removing the bandage that was covering the spider bite, Shelton observed minor swelling with slight edema, a condition where excess fluid accumulates in the body's tissue. (*Id.* at 6.) Shelton also determined that Hairston had a possible MRSA abscess forming. (*Id.*) After observing the possible infection, Shelton notified Dr. Wang of the issue by sending him a photo of Hairston's injury via text message. (*Id.*) Shelton also placed Hairston in isolation to avoid a MRSA outbreak at the jail. (*Id.*) Later that morning, Dr. Wang prescribed Hairston an additional medication, Rifampin, to fight MRSA. (*Id.*) The Rifampin arrived at the jail the following day and Hairston started taking it. (*Id.*)

On October 9, 2024, at Shelton's request, Dr. Wang examined Hairston and performed an incision and drainage procedure on his MRSA abscess. (*Id.*) For the next five days, Shelton and the on-duty watch commander monitored Hairston for any changes or worsening conditions of his MRSA abscess. (*Id.* at 7.) During this period, Shelton provided Hairston with bandages and gauze for him to use, as needed, to change the dressing over the abscess. (*Id.*)

On October 15, 2024, Shelton saw Hairston for a restorative housing physical examination. (*Id.*) During that examination, Shelton observed that the area of the spider bite had closed and was no longer leaking fluid. (*Id.*) Shelton advised Hairston that he was going to be okay. (*Id.*) According to Shelton, Hairston stated that he wanted to be released from the medical hold that had been placed on him. (*Id.*) Because the area of the spider bite was healed and was no longer leaking fluid, Hairston was released from medical observation. (*Id.*) Shelton advised Hairston that he should let jail staff or Shelton know if he had any additional issues with his leg. (*Id.*)

### C. Procedural History

On October 26, 2024, Hairston executed his original complaint. (*See* ECF No. 1 at 2.) On December 14, 2024, Hairston executed an amended complaint (*see* ECF No. 8 at 3), which is his operative pleading.

On February 14, 2025, Shelton moved to dismiss Hairston's amended complaint. (*See* ECF No. 14.) In so doing, Shelton characterized Hairston's amended complaint as raising Eighth Amendment deliberate-indifference claims against Shelton. (*See* ECF No. 15 at 1.) Shelton argued, among other things, that Hairston had failed to plead sufficient facts to support his claims and that, regardless, Shelton was entitled to qualified immunity. (*See id.*)

On September 16, 2025, the court denied Shelton's motion to dismiss. (*See* ECF No. 22.) In so doing, the court first agreed with Shelton that Hairston's claims were for deliberate-indifference in violation of the Eighth Amendment. (*See id.* at 7–8.) But the court determined that Hairston had pleaded sufficient facts to support his claims. (*See id.* at 8–13.) The court first determined that Hairston's allegations were adequate to show that his claimed injuries were sufficiently serious to support a deliberate-indifference claim. (*See id.* at 9–10.) The court also determined that Hairston's allegations, when taken as true and construed in his favor, sufficed to show that Shelton was deliberately indifferent to Hairston's serious medical needs. (*See id.* at 10–13.) In making the second determination, the court held that "any claim based on the pill mix-up relies on Shelton's negligence rather than his disregard of a known risk and does not rise to the level of a constitutional violation." (*Id.* at 10.) But the court "disagreed with Shelton's assessment that [Hairston] ha[d] no plausible claim based on the delay in receiving medical treatment *after* the pill mix-up was resolved." (*Id.* at 11.) (emphasis in original). Finally, the court rejected Shelton's qualified immunity defense. (*See id.* at 13–14.)

On November 14, 2025, Shelton filed the instant motion for summary judgment. (ECF No. 24.) Although Hairston was provided notice of the motion pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (per curiam) (*see* ECF No. 26), he did not file a response in opposition.[3] Accordingly, the motion for summary judgment is ripe for disposition.

## II. STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*,

[3] Indeed, Hairston has not filed anything on the docket since May 12, 2025. (*See* ECF No. 21.)

710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III. ANALYSIS

As noted, the court previously construed Hairston's claims as Eighth Amendment deliberate-indifference claims (*see* ECF No. 22 at 7–8), and neither party has disputed this interpretation of Hairston's claims. Accordingly, the court will assess whether Shelton is entitled to judgment as a matter of law on Hairston's deliberate-indifference claims.

"The Eighth Amendment, which is applicable to states through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Anderson v. Kingsley*,

877 F.3d 539, 543 (4th Cir. 2017) (quoting U.S. Const. amend. VIII). "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). Prison officials also have a duty to provide "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A constitutional violation occurs "when a prison official demonstrates 'deliberate indifference' to an inmate's serious medical needs," *DePaola*, 884 F.3d at 486, or to "conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834.

To establish an Eighth Amendment claim of deliberate indifference, an inmate must satisfy two elements. "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* Second, the inmate must show that the prison official acted with a "sufficiently culpable state of mind," specifically, "deliberate indifference" to the inmate's health or safety. *Id.* Deliberate indifference is an "exacting standard" that is not met by a showing of "mere negligence or even civil recklessness." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The Supreme Court has explained that an official acts with deliberate indifference only when he "knows of and disregards an excessive risk to [an inmate's] health or safety." *Farmer*, 511 U.S. at 837. Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." *Id.* "And, in addition to subjectively recognizing that substantial risk, the prison official must subjectively be aware that his actions were inappropriate in light of that risk." *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016); *see also Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) ("[U]nder the subjective prong, [the plaintiff] can prevail only if the defendants subjectively recognized that there was such a risk [of serious harm] and that their actions were inappropriate in light of that risk.").

As noted, the court previously held that any claim based on the pill mix-up would not rise to the level of a constitutional violation. (*See* ECF No. 22 at 10.) But the court left open the question of whether Hairston could show that Shelton was otherwise deliberately indifferent to Hairston's serious medical needs. (*See id* at 10–11.) Liberally construed, Hairston's amended complaint appears to assert two separate deliberate-indifference claims against Shelton. First, Hairston claims that Shelton was deliberately indifferent to Hairston's serious medical needs by failing to promptly see him after he initially sustained the spider bite. (*See* ECF No. 8-1 at 1.) Second, Hairston claims that Shelton was deliberately indifferent to his serious medical needs by failing to provide adequate medical care after the pill mix-up was resolved. (*See id.* at 3–5.) But based on the uncontroverted evidence before the court, Shelton is entitled to summary judgment as to both of Hairston's deliberate-indifference claims.[4]

In support of his first claim against Shelton, Hairston alleges that, one day after he was bitten, he filed a medical request with Shelton but did not receive a response within the following three days. (*See* ECF No. 8-1 at 1.) Hairston further alleges that, when he filed the medical request, his wound had become "very itchy and irritated." (*See id.*) But these allegations, when construed in the light most favorable to Hairston, merely show that Shelton knew or should have known that Hairston had sustained a spider bite which was causing him mild discomfort. Federal courts within and outside this circuit have held that routine spider bites causing mild discomfort do not rise to the level of a serious medical condition under the Eighth Amendment. *See Boykins v. Orangeburg Cnty. Jail*, No. 5:12-114-JFA-KDW, 2012 WL

[4] In moving for summary judgment, Shelton argues that Hairston has not presented sufficient evidence to show that he suffered from a serious medical condition at the times he claims Shelton provided him deficient care. (ECF No. 25 at 9–11.) Shelton also argues that, even if Hairston had a serious medical need, Shelton was attentive to that need. (*Id.* at 11–13.)

1835755, at *3 (D.S.C. Mar. 27, 2012) ("Although certainly uncomfortable and possibly painful, a spider bite is not a serious medical condition"), *report and recommendation adopted*, 2012 WL 1836115 (D.S.C. May 21, 2012); *Bailey v. NDOC*, No. 2:20-cv-01709, 2023 WL 1765677, at *4 (D. Nev. Feb. 3, 2023) ("It is generally accepted within the medical community that spider bites are typically harmless, and Bailey has not demonstrated that his bite was particularly harmful"); *Davis v. Gusman*, No. 11-2731-SS, 2012 WL 3150047, at *3 (E.D. La. Aug. 2, 2012) ("This Court notes that it has often been held that a routine spider bite does not constitute a 'serious medical need'"); *Ford v. LeMire*, No. 03-CV-10176-BC, 2004 WL 1234137, at *5 (E.D. Mich. June 1, 2004) (granting summary judgment on a deliberate-indifference claim where the plaintiff sustained a spider bite but merely suffered "minor discomfort and a fever"). And Hairston has not provided any evidence to show that Shelton was or should have been aware that Hairston's condition had worsened before Shelton examined him. Hairston has therefore failed to show that, after Hairston initially sustained the spider bite, Shelton was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed or that Shelton "dr[ew] the inference," as is required to prove deliberate indifference. *Farmer*, 511 U.S. at 837. Accordingly, Shelton is entitled to summary judgment on Hairston's first deliberate-indifference claim.

Hairston also claims that Shelton was deliberately-indifferent to his serious medical needs by failing to provide adequate medical care after the pill mix-up was resolved. (ECF No. 8-1 at 3–5.) As an initial matter, the parties present what appear to be overlapping timelines of events that occurred after the pill mix-up was resolved. In his amended complaint, Hairston states that after he received the antibiotic, he took it twice a day for three days but his leg continued to worsen. (ECF No. 8-1 at 3.) Then, in the first week of October 2024, Hairston

submitted additional medical requests, and he was eventually seen by Shelton on October 7, 2024. (*Id.* at 3–4.) Hairston further states that he was placed in segregation until October 9, 2024, when he was seen by Dr. Wang. (*Id.* at 4.) In his declaration, Shelton states that he provided the correct antibiotic medication to Hairston on the morning of Friday, October 4, 2024, and that Hairston took the antibiotics from October 4th through October 7th. (ECF No. 25-1 at 4–6.) Shelton further states that he saw Hairston again on October 7, 2024, during which he observed Hairston's worsening condition and placed him in isolation to avoid a potential MRSA outbreak. (*Id.* at 5–6.) Shelton also claims that Hairston was seen by Dr. Wang on October 9, 2024. (*Id.* at 6.) Based on the above, the parties appear to agree on the timeline of events after the pill mix-up was resolved.

The uncontroverted evidence shows that Shelton was attentive to Hairston's medical needs after the pill mix-up was resolved. In his declaration, Shelton states that Hairston began receiving Bactrim DS the morning of Friday, October 4, 2024. (*Id.* at 5.) Shelton further states that, while Shelton was out of town over the weekend, Childress contacted Shelton to advise him that Hairston's spider bite was worsening and Shelton advised Childress that, if he felt it was necessary, the officer could take Hairston to the emergency room for further treatment. (*Id.*) After not hearing anything further about Hairston's medical condition, Shelton returned to work on Monday October 7, 2024, and Hairston was brought to the medical office that morning to see Shelton for follow-up treatment. (*Id.*) After observing the area around the spider bite, Shelton determined that Hairston had a possible MRSA abscess forming and notified Dr. Wang of the issue by sending him a photo of Hairston's wound via text message. (*Id.*) Shelton also placed Hairston in isolation to avoid a MRSA outbreak at the jail. (*Id.*) Later that morning, Dr. Wang prescribed Hairston Rifampin to fight MRSA, and the medication

arrived at the jail the following day and was provided to Hairston. (*Id.* at 6.) Then, on October 9, 2024, Dr. Wang saw Hairston—at Shelton's request—and performed an incision and drainage procedure on Hairston's MRSA abscess. (*Id.*) According to Shelton, he and other jail staff continued to monitor Hairston until the area of the spider bite was healed and was no longer leaking fluid. (*Id.* at 7.) Shelton also advised Hairston that he should let jail staff or Shelton know if he had any additional issues with his leg. (*Id.*)

Hairston does not dispute the above evidence in his amended complaint. (*See* ECF No. 8-1.) And as noted, Hairston failed to respond to the motion for summary judgment or provide any other evidence for the court to consider on summary judgment. Given the uncontroverted evidence in the record, no reasonable jury could find that Shelton's treatment of Hairston after the pill mix-up was resolved was "so grossly incompetent, inadequate, or excessive" as to violate the Eighth Amendment. *See Gregory v. Prison Health Servs., Inc.*, 247 F. App'x 433, 434 (4th Cir. 2007) (per curiam) (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)). Indeed, the record evidence shows that Shelton was attentive to Hairston's spider bite after the pill mix-up was resolved. *See Rice v. Dotson*, No. 7:25-cv-00234, 2026 WL 1492986, at *6 (W.D. Va. May 28, 2026) (no actionable deliberate-indifference claim where the defendant "continued to treat and prescribe medication to [the plaintiff] throughout the events at issue in [the] case"). Accordingly, Shelton is entitled to summary judgment on Hairston's second deliberate-indifference claim.[5] *See Silverbrand v. Tilton*, No. CV 07-1273-R(CW), 2010 WL 3855556, at *5

[5] Liberally construed, Hairston's amended complaint could be read to assert a claim based on his disagreement with the treatment he received for his spider bite. Indeed, Hairston complains that he never had any blood drawn or any other test performed to confirm that he had MRSA. (*See* ECF No. 8-1 at 4.) But if Hairston intended to raise such a claim, it is without merit. "The Constitution does not provide a right to specific medication or preferred treatment," *Farabee v. Gardella*, 131 F.4th 185, 194 (4th Cir. 2025), and "[a]n inmate's mere disagreement with the course of treatment provided by medical officers will not support a valid Eighth Amendment claim." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (citing *Russell v.*

(C.D. Cal. Aug. 30, 2010) (recommending granting of summary judgment on *pro se* prisoner-plaintiff's claims where "[t]he evidence in [the plaintiff's] verified complaint and attached exhibits does not contradict [the record evidence], nor has [the plaintiff] provided any other evidence to contradict the evidence cited by [the defendants] in moving for summary judgment"), *report and recommendation adopted*, 2010 WL 3855555 (C.D. Cal. Sept. 29, 2010); *see also Sabbats v. Clarke*, No. 7:21-cv-00198, 2022 WL 4134771, at *5 (W.D. Va. Sept. 12, 2022) ("Where a *pro se* plaintiff fails to respond to a defendant's specific evidence contradicting the conclusory allegations of [his] complaint or other submissions, . . . that defendant may be entitled to summary judgment" (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992)).

## IV. CONCLUSION

For the reasons stated above, the court will grant the motion for summary judgment.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 17th day of August, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

*Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam)). And to the extent Hairston questions Shelton's (or Dr. Wang's) medical judgment, such questions "are not subject to judicial review." *Russell*, 528 F.2d at 319 (citing *Shields v. Kunkel*, 442 F.2d 409 (9th Cir. 1971)); *Maddox v. Johnson*, No. 7:09-cv-00179, 2010 WL 8750307, at *4 (W.D. Va. July 30, 2010) (noting that "questions of medical judgment are not subject to judicial review").